**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**THERESA A. SLATTERY,**

      **Plaintiff,**

**vs.**                                   **Case No. 1:10cv175-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


**<u>REPORT AND RECOMMENDATION</u>**

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Theresa A. Slattery, applied for disability insurance benefits and supplemental security income benefits.  Her last date of insured status for disability benefits was June 30, 2009.  Plaintiff alleges disability due to carpal tunnel syndrome and tendinitis of the right arm, neck pain, anxiety, and depression, with onset on

November 1, 2004.  Plaintiff was 48 years of age on April 14, 2008, the date of the

administrative hearing, R. 21-22, has a 12th grade (GED) education, and has past

relevant work as a cashier, inspector (general), and laborer.  The Administrative Law

Judge found that Plaintiff had the residual functional capacity to lift 10 to 15 pounds

generally, but to lift only 5 pounds with her right arm, must avoid repetitive gripping with

her right arm, must avoid climbing activities, and must be able to changes positions at

will.  R. 12-13.   The Administrative Law Judge (ALJ) found that her past relevant work,

inspector (general), and inspector (printed circuit boards), is light, unskilled work, and

that Plaintiff can still do this past relevant work.  R. 17.  Thus, it was concluded that she

is not disabled.

**Legal standards guiding judicial review**[1]

    This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

---

    [1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS'
DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS
DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >.
Information about medical terms and prescription drugs come from DORLAND'S MEDICAL
DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com
(Medical Dictionary link) or MEDLINE PLUS, found at
www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be
found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these
websites are not attached to this report and recommendation as the information is
relatively well-settled, the precise definitions are not at issue in this case, and the
definitions are not likely to be in dispute.

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified that she worked for four months for Huddle House as a waitress, cashier, and dishwasher, ending on September 19, 2007.  R. 22.  She said she was "terminated due to pain and anxiety."  *Id.*  She said that her arms "could not do the job and then I would have an anxiety attack."  R. 23.  She said she could not carry plates with her left arm and could not write with her right arm.  *Id.*  She said that she could not bend her wrist, could not write more than five to ten minutes, and is limited to five pound weights.  *Id.*  Plaintiff said that she has pain in her arms at level 8 everyday.  R. 24.  She was wearing devices on both wrists which she said were prescribed by Dr. Brown for carpal tunnel syndrome.  R. 24-25.

Plaintiff said that she worked at Walmart for about two months in 2005 prior to working for Huddle House.  R. 25.  She said she was placed on medical leave because she was sexually assaulted by the Walmart manager on May 9, 2005.  R. 25-26.  She said she could not go to work after that due to anxiety and panic, and Walmart put her on "long term disability."  R. 26.

Plaintiff said she worked for Georgia Pacific in 2004 as a laborer, picking up scrap wood and shoveling, and suffered three injuries.  R. 26-27.  She worked in that job only a few weeks.  R. 27.  She said that on February 3, 2004, a co-worker dropped a "railroad size beam on my right arm."  *Id.*  She said that the next day, a beam was dropped onto her left arm.  R. 27-28.  She said that on February 7, 2004, a block was dropped from two stories onto the back of her neck between the shoulder blades.  R.

28.  Plaintiff said that she returned to work after these injuries but she was soon

terminated.  *Id.*

When asked to describe the anxiety that she experiences, Plaintiff said that she

does not like being around people, gets very nervous and fearful, and cannot

concentrate or focus.  R. 29.  She said that the anxiety affects her breathing, causes

shaking, and causes inability to communicate effectively or understandably.  *Id.*  She

said that she has these feelings every day.  *Id.*  Plaintiff said that she was initially

treated by "Wanda Ladell" at the Trenton Medical Center, but that she is now receiving

therapy from the Dixie County Health Department.  R. 30.  At one point she had been

taking Zoloft.[2]  Plaintiff testified that she was then taking Albuterol,[3] Percocet,[4] and

Xanax.[5]  Plaintiff said she was not aware of any side effects from these medications.

Plaintiff said that she cannot do anything during the first two hours after waking

due to pain in her neck, shoulders, and down her arms.  R. 31.  She says she has

coffee, does bible study, and then has to lie down "because my head's too heavy."  *Id.*

She spends an hour or two lying down.  R. 32.  She said that then she can do "dishes

---

[2] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[3] Albuterol Sulfate is prescribed for bronchial spasms and used to treat asthma. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE .

[4] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[5] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders. Anxiety associated with depression is also responsive to Xanax.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

lightly," washing "a couple [of] cups." *Id.* After this work, she said she must take a 45

minute break because of burning and pinching sensations in her arms, elbows, radiating

in her shoulder and neck. *Id.* In the evenings she said she does bible study, but can no

longer write. *Id.* She said she sleeps four to six hours.

The vocational expert said that Plaintiff had past relevant work as a cashier

requiring light exertion, SVP[6] 3. R. 35. He also said she had past relevant work as a

general inspector or inspector of printed circuit boards, both requiring light exertion with

an SVP 3 or 4. R. 36.

The ALJ then asked the vocational expert to consider a person with Plaintiff's

past relevant work who can lift 10 to 15 pounds, but only 5 pounds with her right arm,

who must avoid repetitive gripping activities with her right arm, should avoid climbing,

and must be able to change position as needed. R. 37. The expert assumed that

"frequent" meant one third to two thirds of the time, while "constant" would exceed that.

R. 38. He then assumed that "repetitive" meant constant. *Id.* and R. 40. He said that a

need to engage in "frequent" gripping (rather than constant) would be suitable for

general inspector or inspector of printed circuit boards, and that those jobs could be

performed with the other restrictions listed by the ALJ. R. 39. He said that if the ALJ

meant that "repetitive" is "constant," then the answer would change. *Id.* In other words,

if Plaintiff were unable to do "repetitive gripping" with her right arm, meaning constant

gripping, Plaintiff would not be able to do these jobs. R. 40. He said, however, that

---

[6] "The DOT lists a specific vocational preparation (SVP) time for each described
occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled
work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4;
and skilled work corresponds to an SVP of 5-9 in the DOT." *See* SSR 00-4p.

there would be other work that she might do, such as dispatching and telephone work, which would allow position change and would not require reaching or grasping.  *Id.*

The ALJ was asked to add another limitation to the hypothetical, that Plaintiff experiences anxiety two thirds of the day, causing her to withdraw from her work station.  R. 41.  The expert said that such a limitation would preclude Plaintiff's past relevant work and also would preclude all other work.  R. 41-42.

Plaintiff's attorney then asked the ALJ to acquire more evidence, to ask Dr. Nazario to complete a mental residual functional capacity evaluation form.  R. 42.  He pointed out that Dr. Nazario had said that Plaintiff needed to continue with mental health treatment.  R. 43.  He argued that the evidence of anxiety and depression suggested an ongoing, rather than fleeting, mental health problem.  R. 44.

**Medical evidence**

The medical evidence will be discussed in conjunction with each argument presented by Plaintiff rather than separately reported.

**Legal analysis**

### Whether the ALJ erred at step 2 by failing to find that Plaintiff has a severe impairment of anxiety and depression

At step 2, the issue is whether Plaintiff has shown that he or she has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and

not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), quoting Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration." Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), quoting Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

An erroneous finding as to "severe" impairments at step 2 may improperly foreclose a claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities." Flynn, 768 F.2d at 1275.  Impairments must be

evaluated in combination at all stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Impairments must be evaluated in combination even though some impairments are not severe.  Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled."  Davis v. Shalala, 985 F.2d at 534.

On the other hand, even if there is error at step 2, a remand is not needed if error is harmless because the ALJ considered the limiting effects of the impairment at each succeeding step, along with other impairments.  Riepen v. Commissioner of Social Sec., 198 Fed.Appx. 414, 415 (6th Cir. Oct 10, 2006) (not selected for publication in the Federal Reporter, No. 05-2407); Reed-Goss v. Astrue, 291 Fed.Appx. 100, 101 (9th Cir. Aug 25, 2008) (not selected for publication in the Federal Reporter, No. 07-35477); Newton v. Astrue, 2008 WL 915923, *10 (N.D. Ga. Apr 01, 2008) (No. CIV.A.1:06CV1542AJB).

The ALJ here said that a "severe" impairment at step 2 is one that "significantly limits an individual's ability to perform basic work activities."  R. 10.  This, standing alone, seems to be misstatement of the law set forth immediately above.  A "significant" impairment suggests an impairment that is more serious than a just bit more than minimal.  In the next sentence, however, the ALJ correctly stated the law, that an

impairment is not severe when it is "only a slight abnormality . . . that would have no more than a minimal effect on an individual's ability to work . . . ."  R. 10.

The ALJ determined that Plaintiff's mental impairment, anxiety, was not "severe" because in her Function Report-Adult, she said she was able to read, watch television, look for work, talk to friends, clean the house, and care for her animals.  R. 11, citing Ex. 4E (R. 158-165).  The ALJ first relied upon this report to find that Plaintiff has only mild limitations of social functioning because Plaintiff reported that she talked with friends and shopped with them.  R. 12.  The ALJ also relied upon the consultative examination report by Dr. Nazario, indicating that Plaintiff could care for her personal hygiene, clean the house, cook, do laundry, and wash dishes.  From Dr. Nazario's report, the ALJ concluded that Plaintiff has only mild limitations of activities of daily living.  R. 12, citing Ex. 7F (R. 297-299).  The ALJ further relied upon Dr. Nazario's report to conclude that Plaintiff has only mild limitations of concentration, persistence, or pace, noting that Dr. Nazario determined that Plaintiff's memory of recent and remote events was intact and she was capable of managing her own funds.  R. 12.  The ALJ found that there was no evidence of episodes of decompensation.  *Id.*  Finally, at a later point in the opinion, the ALJ determined that Plaintiff's anxiety and depression appear to be controlled by her medications.  R. 16.

Plaintiff completed the function report on July 11, 2006.  R. 158-165.[7]  She said that during the day, she read, watched television, looked for work, talked with friends, cleaned her house, and fed her animals.  R. 158.  She lived with a friend or friends.  *Id.*

---

[7] She completed another one on August 16, 2006.  R. 169-176 (Exhibit 6E).  It is much the same.

She said that she fed the animals only when her friend was not there.  R. 159.  She said she had no problems with personal care and hygiene.  *Id.* and R. 160.  She said that once a week, she cleaned and did laundry for short periods.  R. 160.  She said that she went outside every day.  R. 161.  She said that she shopped for food and necessities, but that her friend also picked up items that she needs once a week.  R. 161.  Her hobbies included music, reading, and watching television everyday, swimming once a month, and working on a computer for about 10 minutes, or writing.  R. 162.  She said she visited others in person for one or two hours every day.  *Id.*  She indicated that she had problems with memory and concentration, in addition to exertional limitations.  R. 163.  She said that she could follow written and spoken instructions well.  *Id.*  She said that she handled stress "pretty well."  R. 164.  But then she said that "all this stuff has created anxiety & stress," and that she cannot work.  *Id.*

Dr. Nazario examined Plaintiff on a consultative basis for a mental status evaluation on September 27, 2006.  R. 297.  He noted that she walked without difficulty, and her posture and gait appeared to be within normal limits.  *Id.*  She was cooperative throughout the interview.  *Id.*  She was 5 feet 6 inches tall and weighed 170 pounds, and had gained 50 pounds in the prior six months.  *Id.*  She alleged disability due to tendinitis[8] in her right arm, neck problems, and carpal tunnel syndrome.  *Id.*  She said that she applied for social security disability benefits because she had injuries to her neck and both arms.  *Id.*  She did not mention anxiety or depression as a basis for disability benefits.

---

[8] Dr. Nazario used the variant of this word, tendonitis.

Plaintiff reported a history of mental illness to Dr. Nazario, with diagnoses of

depression and anxiety.  R. 297.  She said she had been depressed for a couple of

years, had low self esteem, felt worthless, and cried all of the time.  *Id.*  She had not had

any psychiatric hospitalizations, and denied that she had experienced hallucinations.  R.

298.  Plaintiff said that she was anxious and cried daily.  *Id.*  She said she also was

angry a lot.  *Id.*

Plaintiff said that she had participated in inpatient alcohol abuse treatment for 35

days in January, 2005.  *Id.*  She had been sober for the preceding ten years.  *Id.*  She

was convicted of driving under the influence on July 27, 2005.  *Id.*  She said that this

occurred on a day when she had again encountered the man who had raped her.  *Id.*

Plaintiff told Dr. Nazario that she is able to do some cooking, take care of her

personal hygiene, clean house, do laundry, and wash dishes.  *Id.*  She said she could

not work in the yard, but did water plants.  *Id.*  Her daily activities included cooking,

cleaning the house, reading, talking walks, and attending "a lot of medical

appointments."  *Id.*

Dr. Nazario said that Plaintiff was alert and cooperative throughout the interview.

*Id.*  Her mood was somewhat depressed, but her affect was appropriate.  *Id.*  She was

found to be oriented to person, place, and time, and her memory, both recent and

remote, appeared to be intact.  R. 298-299.  She performed a series of mental tests

(similarities of objects, subtractions from 100, counting backwards, recall after a five

minute delay, and repeating four digits backwards) without difficulty.  R. 299.  Dr.

Nazario found that Plaintiff had the ability to concentrate during the testing and

interview.  *Id*.  He also found that she was persistent in her approach, and her pace

appeared to be adequate.  *Id*.  He found no evidence of hallucinations, delusions, or

obsessions, and no evidence of word finding difficulties or aphasia.  *Id*.  Dr. Nazario said

that Plaintiff's judgment and insight seemed to be good.  *Id*.  He thought that she was

capable of managing her own financial affairs.  *Id*.  He said that Plaintiff appears able to

concentrate, able to understand and follow directions, and able to interact with others

appropriately.  *Id*.

    Based upon the symptoms which Plaintiff described, her presentation, and

records reviewed, Dr. Nazario assigned a diagnosis of Major Depressive Disorder,

Recurrent, Moderate, and Anxiety Disorder.  *Id*.  He thought that Plaintiff would benefit

from psychiatric consultation to determine whether she needed medication.  *Id*.

    Plaintiff argues that in addition to the diagnosis by Dr. Nazario, there is other

evidence that should have caused the ALJ to find that Plaintiff had the "severe" mental

impairments of anxiety and depression.  Plaintiff points out that on June 23, 2004, little

over a month after the sexual assault at Walmart, Tri-County Primary Care noted that

Plaintiff had sought care for hypertension and "post traumatic stress."  R. 245.  It was

noted that: "She is having a great deal of trouble with the post traumatic stress,

particularly in light of going back to work since that is the [site] of the assault."  *Id*.  She

had been prescribed Xanax during the day, but she did not want to take it.  *Id*.  She

planned to try to take a quarter or half dose.  *Id*.  On July 13, 2004, she again sought

treatment for anxiety.  R. 243.  On July 26, 2004, she was diagnosed with depression

and panic attack.  R. 240.  On August 17, 2004, however, Plaintiff called Tri-County

Primary Care, and was "very hysterical" and "crying inconsolably."  R. 233.  It was noted

by someone at that facility that:

> She believes that the person who assaulted her has also killed her dog
> and cut her tires.  We are going to get her a work note to get her off of
> work today.  She was advised strongly to call victims['] advocate and talk
> to them, which I am not sure if she will do.  I also tried to let her know that
> while I am willing to help, I will not be nearly as helpful as the victim
> advocate.

*Id.*

On August 18, 2004, however, Tri-County Primary Care released Plaintiff to work

with no restrictions.  R. 234.  On August 25, 2004, Plaintiff returned to Tri-County

Primary Care, reporting that she had had an anxiety attack the night before, and asking

for medication refills.  R. 231.  She reported that since the sexual assault two months

earlier, she had been having panic attacks.  R. 230.  She was encouraged to quit

smoking, but said she could not quit due to her "great anxiety."  *Id.*  Her judgment and

insight were found to be within normal limits, she was cooperative, her mood and affect

were appropriate, and she found to be mildly anxious.  R. 232, 230.

Plaintiff transferred from Tri-County Primary Care to Trenton Medical Center,

Inc., on October 8, 2004.  R. 286.  She said she had been started on Xanax after the

sexual assault and wanted to take something other than Xanax.  *Id.*  She was referred

to Anna Schwait, ARNP, for mental health counseling.  *Id.*  On October 22, 2004,

Plaintiff returned to Trenton Medical Center reporting that she had continued anxiety

and depression due to the sexual assault on May 9, 2004.  R. 287.  The appointment

with ARNP Schwait was to be advanced, and it was determined that she was on "short

term disability since her last day of work, Sept 20th 2004, for her current medical

conditions." *Id.* Depression and anxiety arising from the sexual assault were among the assessments, and Zoloft was prescribed. *Id.*

Plaintiff also notes that on February 11, 2008, about three and one-half years later, she returned to the Trenton Medical Center to discuss medications. R. 380. She had complaints about GERD and left ear discomfort, but apparently had no complaints about depression or anxiety. *Id.* The diagnosis of depression and anxiety caused by the sexual assault in May, 2004, remained on the chart. *Id.*

Finally, Plaintiff notes that she saw Stephen Anton, Ph.D., a licensed clinical psychologist, on February 11, 2009. R. 366. She sought counseling due to problems with her former boyfriend. *Id.* Dr. Anton determined that depression, anxiety, and coping skills were to be addressed in his treatment. *Id.* In what appears to be a note of the "second" session,[9] Plaintiff reported that she felt like she was regaining strength. R. 365. She was having problems obtaining medically needy status to qualify for that health care program. *Id.* Depression, anxiety, and coping skills were again noted as issues to be addressed. *Id.*

In is concluded from this evidence that the finding of the ALJ at step 2 that Plaintiff's anxiety and depression were not "severe" impairments is supported by substantial evidence in the record. The evidence from the treatment records in 2004 indicate that Plaintiff's anxiety and depression were directly related to a recent terrible trauma. On August 17, 2004, Plaintiff's anxiety was greatly exacerbated when someone

---

[9] This note is dated February 11, 2009, but it was probably on February 25, 2009. The next session was scheduled at the first session, on February 11, 2009. R. 366.

who she suspected was her assailant killed her dog and cut her tires. R. 233.  Despite

this, on August 18, 2004, Tri-County Primary Care released Plaintiff to work with no

restrictions.  R. 234.  A few days later, on August 25, 2004, although Plaintiff reported

that she had still been having panic attacks, she was found to be only mildly anxious.

R. 230-232.  On October 22, 2004, Trenton Medical Center determined that she was on

"short term disability since her last day of work, Sept 20th 2004, for her current medical

conditions."  R. 287.  All of this evidence from 2004 indicates that Plaintiff's anxiety was

directly related to the sexual assault, and that while she suffered significant anxiety and

panic in the months immediately thereafter, the disability was thought to be mild or short

termed.

There is no record of mental health treatment after 2004, except to indicate that

Plaintiff took medications for anxiety and depression.  There is no record of the severity

of her experience of anxiety and depression with medication.  The next record, in 2008,

simply reported the historic diagnosis of anxiety and depression in 2004, but there was

no contemporary complaint about anxiety or depression.  The record from 2009 was

again an apparently short-term situational problem, anxiety and depression caused by a

relationship with a former boy friend.

Further, the evidence from Plaintiff's own function report and the report to Dr.

Nazario provide substantial evidence for the ALJ's findings that Plaintiff has only mild

limitations in activities of daily living, social functioning, concentration, persistence, and

pace, and has had no episodes of decompensation.  Indeed, relying upon the findings

of Dr. Nazario, the ALJ might properly have found that Plaintiff has no limitations in

concentration, persistence, and pace.  For these reasons, the first argument is not

persuasive.

> **Whether the ALJ's rejection of Plaintiff's description of the pain and the anxiety she suffers correctly follow the law of this circuit**

Pain and other symptoms reasonably attributed to a medically determinable

impairment are relevant evidence for determining residual functional capacity.  Social

Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or

non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated by

the ALJ for disregarding the claimant's subjective testimony must be based upon

substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d

1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this

circuit's standard if his findings "leave no doubt as to the appropriate result" under the

law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).  "A claimant's

subjective testimony supported by medical evidence that satisfies the pain standards is

itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone

can be disabling, even when its existence is unsupported by objective evidence." <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).  "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  <u>Id</u>. at 1562, <i>quoting</i>, <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983).

The ALJ here determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [pain, depression, and anxiety] are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  R. 16.  The ALJ reasoned:

> According to the claimant's testimony she indicated that due to tendonitis in her right arm, neck problems and carpel tunnel she could not use her arms for more than 5 minutes before the pain begins.  The claimant however indicated in the Function Report (Exhibit 6E) that she was able to take showers, clean the house, do laundry and cook.  The claimant further testified that she was experiencing difficulty concentrating and trying to understand others.  However this was inconsistent with Dr. Nazario's findings in Exhibit 7F where the claimant was able to perform a series of mental status tests without error or difficulty.  She was able to subtract 7 from 100 and able to count backwards from 20.  In addition claimant reported that she was able to read a lot of self help books.  The claimant is alleging constant anxiety and depression; however it appears to be controlled by medications.  In addition she stated that she was regaining her strength and that she felt less overwhelmed and she was taking a proactive role in acquiring services necessary to resume work (Exhibit 16F).

R. 16.  The ALJ also gave great weight to the opinion of Dr. Depaz, that Plaintiff should avoid repetitive gripping activities with her right arm, should avoid climbing, must have the ability to make position changes as needed, and can lift 10 pounds occasionally, but

only 5 pounds with her right arm.  *Id.*  The ALJ found that these limitations were consistent with the objective medical findings in the record.  *Id.*

This reasoning is supported by substantial evidence in the record.  While admissions as to ability to do daily activities is often not significant evidence of ability to do work,[10] it is evidence relevant to a credibility decision when the objective medical evidence is also not especially supportive of the testimony.  Plaintiff's own report of her ability to function was significantly at odds with her testimony and the objective medical evidence, to be discussed ahead, and the ALJ was justified in taking that report into account.  The ALJ's determination that Plaintiff's testimony as to her ability to concentrate and understand others was not credible is likewise justified based upon the findings of Dr. Nazario.  Finally, the finding as to the lack of limitations due to anxiety and depression is justified for the reasons discussed earlier.

---

[10] Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

Plaintiff was examined by Oscar B. Depaz, M.D., on April 5, 2006.  R. 273.  Her

chief complaint was pain in her right arm caused by the dropping of a log on her arm at

work, on February 3, 2004.  *Id.*  Dr. Depaz said that an MRI scan in March, 2004,

showed only tenosynovitis of the wrist.  *Id.*  He also noted that testing on November 9,

2005, revealed neuropathy of the right wrist and chronic C6 radiculopathy in the right

upper extremity.  *Id.*  He noted that she had suffered two work related injuries to her left

arm in February, 2004.  Plaintiff told Dr. Depaz that her pain could be as much as 7 on a

scale of 10, with spasms and tension in her right arm and neck pain referring down both

arms.  *Id.*  She said that lifting or prolonged activities with the right more than the left

bothers her.  R. 274.  Intermittent use of a splint had helped with the pain.  *Id.*  She

reported numbness, tingling, and weakness of her right arm.  *Id.*  She was then taking

Zoloft[11] 5 mg daily and Clonidine[12] for anxiety.  *Id.*  She still smoked as much as one

and one half packs of cigarettes per day but said that she no longer drank alcohol.  *Id.*

Plaintiff complained of pain in her neck and both arms.  R. 274.  On examination,

Dr. Depaz found that she had tenderness to palpation of the paracervical areas, more

on the right than the left.  *Id.*  The neuroforaminal compression test of the cervical

---

[11] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[12] Clonidine is an antihypertensive drug used in the form of its hydrochloride $C9H9Cl2N3 \cdot HCl$ especially to treat essential hypertension, to prevent migraine headache, and to diminish opiate withdrawal symptoms.  MEDLINE PLUS (MERRIAM-WEBSTER).

region, Spurling's test,[13] and Lhermitte's sign[14] were negative for pain, however.  R. 275.

Plaintiff had full range of motion of her cervical spine and shoulders, though motion of

Plaintiff's shoulders was "done in a slow tentative manner."  *Id*.  Plaintiff had slow

tentative range of motion of both wrists, with mild limitations.  *Id*.  Tinel's sign,[15] Phalen's

sign,[16] and transverse carpal ligament compression were also negative bilaterally.

Allen's test for blood flow in the hands was negative revealing ulnar and radial artery

patency.  *Id*.  Dr. Depaz said that Plaintiff's affect was somewhat anxious, but her motor

strength was symmetric, and Hoffman's sign[17] was negative.  Dr. Depaz's assessment

---

[13] Spurling's sign is a test is used for evaluation of cervical spine radiculopathy.  The patient laterally bends the neck to each side while maintaining a posture of cervical extension.  Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy.  Pain with contralateral bending suggests musculo-ligamentous origin.  UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at: http://www.med.ufl.edu/rheum/rheumTests.htm

[14] Lhermitte's sign is the sudden transient electric-like shocks extending down the spine triggered by flexing the head forward due to a disorder such as compression of the cervical spine (the portion of the spinal cord within the neck).  MedicineNet.com, available at http://www.medterms.com.

[15] Tinel's sign is:  "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[16] "Phalen's test is used in carpal tunnel syndrome where forcible palmar flexion of the wrist causes venous engorgement of the canal and an exacerbation of the symptoms."  Gpnotebook (www.gpnotebook.co.uk).  "Phalen's maneuver is described as follows:  the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for 30 to 60 seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure for 30 to 60 seconds."  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[17] Hoffmann's sign is a digital reflex of the fingers.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

was tenosynovitis of the right arm from an injury, vocational dysfunction, chronic pain, and smoking. *Id.* Based on C6 radiculopathy that was seen on the "EDX," he thought that an MRI scan would be beneficial to rule out intraspinal pathology. *Id.* It was Dr. Depaz's opinion that Plaintiff should avoid "repetitive gripping activities with the right arm," should avoid "climbing activities," "should have ability to make position changes as needed," and was limited to lifting 10 to 15 pounds "generally" but limited to 5 pounds lifting with the right arm. R. 276.

In summary, the ALJ's finding as to Plaintiff's ability to do daily activities is supported by the findings of Dr. Depaz. While Dr. Depaz acknowledged that Plaintiff had some chronic pain and some C6 radiculopathy, most of the tests he performed for cervical, arm, or hand disability were negative for disability. Dr. Depaz reasonably accounted for the limitations that Plaintiff has by the functional limitations he assigned, which were adopted by the ALJ. Those limitations are in accord with Plaintiff's reported activities of daily living.

Plaintiff argues that the ALJ overlooked the study done by Dr. Leber on November 9, 2005. Doc. 11, p. 12, citing R. 15. The ALJ was then discussing the June 20, 2008, findings of Dr. Valenstein. R. 15. When the ALJ said that "there was not found any other neurological deficits to explain the claimant's subjective symptoms of neck pain radiating to both arms," the ALJ was referring only to the findings by Dr. Valenstein. *Id.*; see R. 363. Earlier in the opinion, however, the ALJ discussed the findings of Dr. Leber. R. 14. The findings of Dr. Leber, therefore, were not overlooked. Indeed, the testing by Dr. Leber on November 9, 2005, were acknowledged by Dr.

Depaz.  R. 273.  This is why Dr. Depaz recommended an MRI of Plaintiff's cervical spine.  R. 275.

On November 9, 2005, Plaintiff told Dr. Leber that her chief complaint was pain and dysfunction in her right upper extremity.  R. 277.  She said her arm felt heavy and dead at times, that she has cramps in her arm, and that she has trouble writing.  *Id*.  Dr. Leber said that apparently she was told she had tendinitis after an MRI.  *Id*.  Plaintiff said that her pain was intermittent, of moderate (7/10) severity.  *Id*.  She said that the pain refers to the wrist, elbow, and shoulder on the right side.  *Id*.  The pain was improved with medication and injections.  *Id*.  Her medication was ibuprofen.  R. 278. On examination, Dr. Leber found that Plaintiff had "some discomfort, mainly in the RUE [right upper extremity] more than the left."  *Id*.  She had:

> functional motion in the shoulders, elbows, fingers, and cervical spine.  No severe crepitus, instability, or deformity.  She does have tenderness in the [right upper extremity] to palpation of the forearm and arm.  She can make a composite fist bilaterally w/o difficulty.

R. 278.  Her mood and affect were appropriate, and she was alert and oriented.  *Id*. She was found to have mild decrease in grip strength on the right compared to the left, and 4+ strength out of 5 in the other muscle groups in the right upper extremity compared to the left.  *Id*.  Her coordination was intact.  R. 279.  She had diffuse paresthesias in the right upper extremity.  *Id*.  Her coordination was intact, and her reflexes were 2+ and symmetric at the elbows and wrists, bilaterally.  *Id*.  She was then

given an EMG test.[18]  *Id*.  The results were abnormal.  *Id*.  The EMG revealed mild

median neuropathy at the right wrist, and chronic radiculopathy in the right upper

extremity.  *Id*.  Dr. Leber found no evidence of generalized peripheral neuropathy in the

right upper extremity.  *Id*.

The ALJ also reviewed evidence from a consultative examination by Dr.

Chodosh.  R. 15.  The ALJ noted that Dr. Chodosh found that Plaintiff was slightly

depressed, but he thought that her chronic depression was complicated by chronic

active alcoholism.  *Id*.  He noted that Dr. Chodosh found that Plaintiff had slightly

decreased range of motion in the neck, right arm, and right wrist.  *Id*.  He noted that Dr.

Chodosh said that the cause of these symptoms was not clear and that there was no

evidence of significant impairment.  *Id*.  Finally, the ALJ noted that Dr. Chodosh was of

the opinion that Plaintiff was able to stand, walk, sit, stoop, squat, kneel, lift, carry,

handle objects, see, hear, and speak normally.  *Id*.  All of these findings are supported

by substantial evidence in the record, the medical records from Dr. Chodosh.  R. 332-

338.  Further, Dr. Chodosh determined that Plaintiff's strength was fully intact, her

manual dexterity (ability to write, remove and replace a screw cap on a small bottle),

and her coordination were good.  R. 334.  Her sensation was normal.  *Id*.  Finally, Dr.

Chodosh said that while Plaintiff had chronic pain in her neck, right arm, and right wrist,

---

[18] An EMG is an electromyogram.  Electromyography is an electrodiagnostic
technique for recording the extracellular activity of skeletal muscles at rest, during
voluntary contractions, and during electrical stimulation.  DORLAND'S MEDICAL
DICTIONARY FOR HEALTHCARE CONSUMERS.

the "cause of these symptoms is not clear, and there is no physical evidence of significant impairment."  R. 338.

On June 20, 2008, Plaintiff was evaluated by Edward Valenstein, M.D., a neurologist.  R. 362-364.  Dr. Valenstein noted that an MRI had been done in January, 2008, which reported mild disk disease from C3-C4 to C7-T1.  R. 362.  Plaintiff's current medications were Xanax, Oxycodone,[19] and multivitamins.  *Id.*  She reported that she consumed alcohol two or three times a week, and had quit drinking "many times in the past."  R. 363.  She was able to recall three objects in five minutes, to spell "world" backwards, and to perform serial subtractions of 7 from 100 for up to five minutes without problems.  *Id.*  Her muscles had normal tone and bulk, and her strength was intact.  *Id.*  Sensory perception was also intact.  *Id.*  Limited nerve conduction studies of her left hand suggested carpal tunnel entrapment of moderate severity.  *Id.*  Plaintiff declined studies of her right hand.  *Id.*  Dr. Valenstein wrote: "We do not find any other neurological deficits to explain her subjective symptoms of neck pain radiating to both arms, and the mild cervical disk disease seen on MRI studies do not explain her symptoms."  R. 363.  A wrist splint was recommended for her left wrist, and surgery was recommended if the problem did not respond to splinting.  R. 363-364.  Dr. Valenstein concluded: "I suspect that depression and secondary gain may also play a role in these symptoms."  R. 364.

_____

[19] Oxycodone, a narcotic analgesic, is used for its calming effect and for pain and is one of the two ingredients in Percocet.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

In summary, the ALJ's findings as to Plaintiff's credibility are supported by substantial evidence in the record which the ALJ discussed in his opinion.  This argument is not persuasive.

### Whether the ALJ erred by ignoring the vocational expert's testimony that Plaintiff cannot do her past relevant work as a general inspector

The record of the vocational expert's testimony as to whether Plaintiff could still do her past relevant work as a general inspector or as an inspector of printed circuit boards is very confusing.  The ALJ's determination of Plaintiff's residual functional capacity adopted the restrictions imposed by Dr. Depaz, that Plaintiff should avoid "repetitive gripping activities with the right arm," should avoid "climbing activities," "should have ability to make position changes as needed," and is limited to lifting 10 to 15 pounds "generally," but is limited to 5 pounds lifting with the right arm.  R. 276, 12-13.  The ALJ then assumed these restrictions in the hypothetical question for the vocational expert.  R. 37.

The vocational expert said that he needed to do some research "in terms of the past relevant work" concerning the "restriction with the repetitive gripping."  R. 38.  Since the vocational expert is an expert as to the exertional requirements of common jobs, I read this as a statement as to a need to consult expert resources to see whether the jobs of general inspector and inspector of printed circuit boards required an ability to do repetitive gripping.  The vocational expert reported that the physical demands of "reaching, handling and fingering" would "equate" to "grasping or gripping."  *Id.*  The vocational expert then asked the ALJ whether the term "repetitive" meant a "constant

demand or frequent, frequent being defined as one third to two third[s] of the time, constant would exceed that or repetitive.  Would repetitive exceed frequent?"  *Id*.  At that point, it would seem that the vocational expert was no longer trying to determine the exertional requirements of the job, but was trying to understand the exertional limitations in the ALJ's hypothetical, that is, Plaintiff's functional limitations.  The ALJ responded that the ALJ could "only relate to what the doctor says."  *Id*.  Left without guidance, the vocational expert decided that "repetitive" meant "constant."  *Id*.  I must assume that here, the vocational expert was defining Plaintiff's exertional limits, not the exertional requirements of the past relevant work.

The vocational expert then said that a frequent demand (for gripping) "would not significantly erode the requirements and based on that criteria, the reading or handling is placed at a frequent physical demand in terms of the inspector job for electronics or general inspecting jobs."  R. 38-39.  The vocational expert still had not plainly said what the "requirements" were for this past relevant work, but this sentence seems to implicitly say that the two jobs, general inspector and inspector of printed circuit boards, only required a gripping ability at the "frequent" level, that is, one to two thirds of the time, but not "constantly."  The vocational expert then said: "And based on that criteria, the jobs listed as general inspector and inspector printed circuit boards would be within the parameters of your hypothetical."  R. 39.  Had the testimony ended there, the testimony, while not especially clear, would implicitly support the ALJ's finding that Plaintiff could still do those jobs even though she was unable to grip constantly,

The evidence then became muddy.  Plaintiff's attorney asked: "If we define repetitive as constant, that would change your answer?"  The vocational expert said it would.  R. 39.  He said: "Anything exceeding a frequent physical demand would be nonviable based on the hypothetical."  *Id.*  The following exchange then took place:

Q    And in the job as an inspector, based upon your experience
     as a vocational expert, you've made that determination that
     repetitive means frequent?

A    No, I was making the determination that repetitive would
     equate to a constant physical demand, not frequent.

Q    So your opinion that repetitive would equal constant.

A    Approaching certainly constant if not at constant.

Q    And the constant would – constant no gripping activities [sic],
     would rule out the past relevant work.

A    Right, and that's, again, considering a unilateral right upper
     extremity restriction, not bilateral.

R. 40.  This passage seems to indicate that the vocational expert assumed that Plaintiff was incapable of "constant" gripping activity and that that restriction would cause her to be unable to do her past relevant work as a general inspector or an inspector of printed circuit boards.  The implicit corollary is that the vocational expert thought that those two jobs required the ability to constantly grip objects.

This ambiguity ordinarily would require a remand for clarification.  That is not needed here.  The vocational expert further testified that there were other jobs in the national which Plaintiff could do, even if one assumed that she was not capable of constant gripping activity.  He said that she could do work as a dispatcher or telephone

work, both of which would allow positional change and "would not be impacted as greatly upon with a reaching or grasping restriction as the potential of the jobs that was mentioned in the hypothetical."  R. 40.  Thus, a finding of not disabled would be a foregone conclusion at step 5, even if the vocational expert's testimony at step 4 (concerning past relevant work) was misunderstood by the ALJ.  A remand, therefore, is not needed.

Plaintiff's attorney also asked the vocational expert whether she could do any work if she experiences anxiety two thirds of the day.  R. 41.  The ALJ said that that sort of impairment would "preclude the jobs mentioned as well as other work."  R. 42. However, as discussed above, it was not error for the ALJ to discount Plaintiff's testimony and conclude that she does not suffer anxiety two thirds of the day.  Thus, it was not error to add this nonexertional impairment to the hypothetical posed to the vocational expert.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law.  The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on June 29, 2011.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**